

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-16-00245-CV

JON GOWER, INDIVIDUALLY AND
AS REPRESENTATIVE OF THE
ESTATE OF AARON ASHLEY
GOWER

APPELLANT

V.

UNIVERSITY BEHAVIORAL
HEALTH OF DENTON A/K/A UHP,
LP D/B/A UNIVERSITY
BEHAVIORAL HEALTH OF
DENTON; UNIVERSAL HEALTH
SERVICES, INC.; AND NISHENDU
M. VASAVADA, M.D.

APPELLEES

----------

FROM THE 431ST DISTRICT COURT OF DENTON COUNTY
TRIAL COURT NO. 14-07848-431

----------

## MEMORANDUM OPINION[1]

----------

Appellant Jon Gower, individually and as representative of the Estate of Aaron Ashley Gower, appeals the trial court's dismissal of his health care liability claims against appellees University Behavioral Health of Denton a/k/a UHP, LP d/b/a University Behavioral Health of Denton (University); Universal Health Services, Inc. (Universal); and Nishendu M. Vasavada, M.D. The trial court dismissed Gower's claims because the expert report that he served on appellees did not comply with provisions of chapter 74 of the civil practice and remedies code.[2] On appeal, Gower contends that the trial court should not have dismissed his claims because the report was sufficient or because the court should have granted him an opportunity to cure any deficiencies. He also argues that the trial court erred by considering documents outside of the report to determine the report's sufficiency and that the court improperly awarded attorney's fees to appellees. Appellees contend that the report did not qualify as a good faith effort to comply with the statutory requirements and that under the circumstances of this case, the trial court was not required to grant an opportunity to cure.

---

[1]*See* Tex. R. App. P. 47.4.

[2]Tex. Civ. Prac. & Rem. Code Ann. §§ 74.001–.507 (West 2017).

2

Because we hold that the report was deficient but that Gower was entitled to an opportunity to cure, we reverse and remand.

**Background Facts**

In September 2014, Gower sued appellees, seeking damages. In his original petition, Gower alleged that in January 2013, Aaron, Gower's son, had been admitted to a mental health hospital and had died there the next month. Gower alleged that Aaron had presented to the hospital with symptoms of insomnia, depression, suicidal gestures, hearing voices, and agitation. According to Gower, during Aaron's time at the hospital, he was manic, distraught, delusional, and depressive. Gower pled that near noon on February 2, 2013, Aaron was found face down in his room; he had vomit in his mouth and was unresponsive. Paramedics took Aaron to an emergency room, where he died four days later from respiratory failure, brain death, pneumonia, and sepsis.

Gower alleged that during Aaron's treatment, University (as a health care provider) and Dr. Vasavada (as a specialist in the field of psychiatry) had acted negligently. Specifically, Gower pled that University and Dr. Vasavada had been negligent and grossly negligent by, among other acts, prescribing excessive medication, failing to properly monitor Aaron, failing to adequately assess him upon presentation and stabilize him thereafter, failing to ensure that he was seen by qualified health care providers, and failing to properly supervise him. Gower further pled that Universal owns and operates University and was negligent and

3

grossly negligent by failing to use ordinary care to monitor and supervise its employees, failing to properly secure the premises and protect psychiatric patients from harm, failing to use ordinary care to protect Aaron from the danger presented by employees and other patients, failing to adequately warn Aaron of the dangers presented by the lack of proper security on the premises, and failing to have or enforce policies and procedures on various matters.

Each appellee answered the petition in November 2014. In January 2015, Gower served appellees with an expert report. Dr. Leo Borrell, a board certified psychiatrist, wrote the report. Concerning the events related to Aaron's death, the report stated,

> On January 16, 2013, [Aaron] voluntarily checked himself into [University]. He presented with agitation, bizarre behavior, severe anxiety, suicidal ideation, and . . . synthetic marijuana (K2) abuse. He reported a history of depression and chemical dependency. [Aaron], 22 years old at the time, was admitted to adult inpatient care at [University] for psychiatric stabilization under the care and treatment of psychiatrist Dr. Nishendu M. Vasavada. . . .
>
> [Aaron] was diagnosed [with] bipolar disorder with psychotic features and K2 and marijuana abuse. He was delusional and also had a history of suicide ideation. . . . [He] remained in [University] until February 2, 2013, as in inpatient in the [Critical Stabilizing Unit].
>
> The records reflect that [Aaron] was initially prescribed Depakote and Seroquel but refused to take either[,] stating he was worried about the side effects. . . . On January 23, he was . . . administered Vistaril 50 mg because he was suffering from severe anxiety. On January 28, there was a change in [Aaron's] behavior and he became very distraught. He was suffering from a great deal of depression, anxiety, agitation[,] and delusional thinking. . . . [Aaron] became hypertensive, so an internal medicine consult was ordered and he began taking [Lisinopril] . . . and Clonidine . . . on

4

January 31.  Dr. Dipprey,[3] the internal medicine specialist that treated [Aaron] for hypertension[,] did not note any specific findings in his charts.  On February 1, . . . [Aaron] appeared to be somewhat sedated. . . .

When Dr. Vasavada saw [Aaron] around 10:30 a.m. on February 2, he noted that [Aaron] was sedated . . . and needed to be seen by a medical doctor.  According to medical records, around noon [Aaron] was sleeping in his room and began making strange noises.  The nursing staff . . . found him unconscious with vomit in his mouth.  A code blue was called . . . .  His eyes were fixed and dilated. . . .

[Aaron] was transferred to [a hospital] where he was placed on life support.  His family was advised [he] had suffered severe brain damage due to a lack of oxygen for an extended period of time leading up to the time he was found at [University].  [Aaron] was pronounced dead on February 6, 2013.

In the report, Dr. Borrell separated his discussion of the alleged negligence of Universal, University, and Dr. Vasavada.  With respect to Universal, Dr. Borrell wrote,

At all relevant times [Universal] owned . . . and managed [University] . . . .  [Universal] held itself out as providing for the diagnosis, treatment, and care of [psychiatric] patients . . . .  [Universal] owed a duty to [Aaron] to act as a reasonably prudent owner, operator, and/or management company of an inpatient psychiatric facility under the same or similar circumstances.

. . . [Universal] committed one or more of the following acts . . . of negligence[:] . . . failing to use ordinary care to monitor and supervise its employees charged with the care and supervision of psychiatric patients, *including but not limited to the plaintiff [R.H.]*, all of which posed an unreasonable risk of harm to patients like the plaintiff[;] . . . and failing to have/or enforce policies and procedures on: 1) Failing to use ordinary care in the hiring, monitoring,

[3]Gower added Dr. Trisha Dipprey as a defendant through his first amended petition.  Dr. Dipprey is not a party in this appeal, and Gower states that she has been dismissed from the underlying suit.

5

evaluating[,] and supervising [of] employees and staff charged with the care and supervision of psychiatric patients; 2) Conducting appropriate screening/review of credentials for staff physicians; 3) Ensuring patient safety; 4) Preventing the prolonged hospitalization of patients for the purpose of profit over patient care; and 5) Implementing proper procedures to ensure patients were properly evaluated and treated from the time of admission through the time of discharge.

Further, [Universal] is liable for the negligent acts and omissions of its various agents . . . pursuant to the doctrine of *respondeat superior* . . . . Each of the above-cited acts . . . [was] foreseeable and a proximate cause of the injuries, damages, suffering[,] and death of [Aaron]. [Emphasis added.]

Concerning University's alleged negligence, Dr. Borrell stated in his report

that University

breached the standard of care in this matter. On the occasion(s) in question, as described herein, [University] committed one or more of the following acts . . . of negligence[:] . . . failing to use ordinary care to monitor and supervise its employees charged with the care and supervision of psychiatric patients, including but not limited to [Aaron], . . . and failing to have/or enforce policies and procedures on: 1) Hiring, monitoring, evaluating and supervising employees and staff; 2) Conducting appropriate screening/review of credentials for staff physicians; 3) Ensuring patient safety; 4) Prescribing excessive medication to [Aaron] under the circumstance[s][;] 5) Failing to properly monitor [Aaron's] condition; . . . 6) Failing to provide the appropriate level of supervision; [and] 7)[ ]Failing to properly stabilize [Aaron].

I have experience and I am familiar with the standard of care that . . . hospitals treating mental healthcare patients should follow when a patient's vitals are out of normal range. . . . First, a registered nurse must supervise and evaluate the nursing care for each patient. Thus, once a patient's vitals are above the normal range, it is imperative that those vitals are re-checked and that there is nurse or even physician intervention if necessary. [Aaron's] blood pressure and heart rate were above the normal range on several occasions during his time as an inpatient . . . . [O]n each of these occasions, [Aaron's] blood pressure and heart rate should have

6

been re-checked, a nurse should have been notified, and nurse intervention should have occurred. The staff failed to do this . . . . [Aaron's] blood pressure and/or heart rate were out of the normal range and no follow-up and/or re-check was completed . . . .

Finally, in the section of the report concerning Dr. Vasavada's alleged negligence, Dr. Borrell stated,

Further, the internal medicine specialist, Dr. Dipprey, who evaluated [Aaron's] hypertension did not note *anything* in his chart. The only thing that is noted is that [Aaron's] hypertension was "treated." No specific findings are mentioned nor even what testing and procedures Dr. Dipprey performed. Dr. Vasavada was the attending and was similarly responsible for monitoring [Aaron's] medical conditions and changes thereto at all time[s], including ensuring proper orders were put in place to manage and monitor [Aaron's] blood pressure and heart rate. Moreover, Dr. Vasavada's discharge summary merely states that an internal medicine consult was ordered and that [Aaron] was evaluated, but once again no specific findings are documented. [Aaron's] chart has no indication of proper treatment relating to his hypertension. . . .

There were also other occasions that [Aaron] exhibited unusual behavior and/or symptoms and no follow-up or interventions were taken. . . . In all of the above instances, [University] did not meet the standard of care in that it failed to ensure registered nurses supervised and evaluated the nursing care of [Aaron], and the signs and symptoms associated with his changing medical condition. Specifically, [Aaron's] vitals and life-threatening condition were either not documented and/or his vitals were not properly monitored and re-evaluated.

Furthermore, I am familiar with the standard of care required in emergency situations like [Aaron's], when he was found unresponsive in his room on the floor. The patient has the right to receive care in a safe setting . . . . [University] did not meet the standard of care in that it had inadequate emergency equipment needed to resuscitate [Aaron]. Namely, the pads for Automated External Defibrillator (AED) were not available on the crash cart causing the AED to be useless. (See Dept. of Health Complaints – Investigation dated 5/16/13).

7

Dr. Borrell closed his report with a summarizing paragraph about the alleged negligence of all three defendants:

> In summary, the conduct called into question is the failure by [University], its parent company [Universal], Dr. Dipprey, and Dr. Vasavada to recognize and properly treat [Aaron's] symptoms and failure to provide the appropriate medications that ultimately led to his untimely death. Furthermore, the parties also failed to meet the standard of care as described above by failing to adequately respond to [Aaron's] distress or to have the proper life-saving equipment available. It is my opinion that the failures set forth above were the proximate cause of [Aaron's] death. Namely, had [Aaron's] high blood pressure been properly monitored and treated in a timely manner so as to investigate the cause, or had [University] had the appropriate life-saving equipment, it is my opinion that to a reasonable degree of medical probability he would have received timely treatment of his condition and [would have] survived.

University, Universal, and Dr. Vasavada all filed timely objections to the adequacy of Dr. Borrell's report. They all contended that the report did not qualify as a good faith effort to satisfy the requirements of section 74.351 of the civil practice and remedies code. They all argued that the report failed to establish Dr. Borrell's qualifications to opine about the subjects discussed within the report and did not sufficiently describe the applicable standard of care, how each defendant breached the standard, and the causal relationship between the alleged breaches and Aaron's death. Dr. Vasavada also noted that the report discussed the care received by an unknown patient, R.H. University and Universal attached documents to their objection to Dr. Borrell's report, including a report from Aaron's autopsy stating that he had died from dural sinus thrombosis with associated brain edema.

8

Dr. Borrell did not amend his report to address the deficiencies asserted by appellees' objections. Months after appellees filed their objections, they filed motions to dismiss Gower's lawsuit for his failure to serve an expert report that complied with section 74.351. Gower responded to the objections and the motions to dismiss. He contended that Dr. Borrell's report represented a good faith effort to comply with the statute. Alternatively, he argued that he should be granted leave to file an amended expert report to correct any deficiencies.

Universal and University replied to Gower's response. They restated their contentions that Dr. Borrell's report failed to establish his qualifications to opine about their standard of care, failed to explain the standard of care or how the standard of care was breached, and failed to adequately address causation from any such breach to Aaron's death. They also contended that the trial court could consider the documents attached to their objections, which they asserted showed that some of the factual statements in Dr. Borrell's report were inaccurate. With respect to Gower's alternative request for an opportunity to cure any deficiencies in Dr. Borrell's report, Universal and University argued,

> [Gower's] lack of any attempt to provide a compliant report (when there was ample time to do so after [appellees] filed their objections and before [Gower's] deadline expired) or even correct the misinformation, misrepresentation[,] and fabrication asserted by Dr. Borrell . . . clearly demonstrates that there was no good faith effort made, and thus, [Gower] is not entitled to obtain the requested 30 day extension . . . .

The trial court held a hearing on the motions to dismiss. By the time the court held the hearing in April 2016, more than a year had passed since

9

appellees had first objected to Dr. Borrell's report. During the hearing, the trial court made the following observation:

> I would expect in a medical malpractice case to be able to read the report and understand precisely how and why the patient died, at least in a case involving a fatality, and I am left after reading this report with confusion as to, you know, other than the medical terminology, what the cause of death really was and how that in any way relates back to any neglect by the [defendants].

Also at the hearing, with respect to whether the trial court should grant Gower an opportunity to amend the report to cure any deficiencies, counsel for Universal and University stated,

> There were a couple of things that were glaring on their face that should have been fixed and there's been no attempt to fix in over a year and no attempt to fix in the last six months since the reply was filed. And there have been additional conversations held with opposing counsel . . . where those specific things were discussed and no attempt has been made. And I will just leave it at that. I think the time that's gone by and the lack of effort to correct not only those things but other things as well is indicative of a lack of good faith, Your Honor.

Finally, in explaining why it would be granting the motions to dismiss, the trial court stated,

> In this case, this is not a difficult call for me. And while I am sympathetic with the fact that a young person lost [his] life, I simply don't believe this report is a good faith representation of any opinion that would justify not only the expert's qualifications to render the opinions that are given, but to explain the basis factually or causally for those opinions. And because of that, coupled with the failure to even attempt to remedy the obvious error in the report, if not errors in the report, I similarly find that it is not a good faith effort to bring the report into compliance as could have been done any time during the last year, and therefore will not only . . . sustain the objections and grant the dismissal of the case, but I am going to deny [Gower] an opportunity to revise or modify the report in the next 30 days.

Following the hearing, the trial court signed orders sustaining appellees' objections to Dr. Borrell's report and granting their motions to dismiss. Gower filed a motion for new trial in which he alleged that he should have been given an opportunity to cure any deficiencies in the report. To the motion for new trial, Gower attached an amended report written by Dr. Borrell. He also attached, for the first time, a report written by Richard Bays, a registered nurse. In his report, Bays opined about the standards of care, alleged breaches of the standard, and causation related to University.

University and Universal filed a motion to strike Dr. Borrell's amended report and Bays's report on the ground that they were untimely. Dr. Vasavada also objected to Dr. Borrell's amended report and responded to Gower's motion for new trial, contending that the trial court's "action of denying an opportunity cure was justified by the incurable nature of the deficiencies." After holding a hearing on Gower's motion for new trial, the trial court denied it. Gower brought this appeal.

## The Trial Court's Dismissal Decision

In his first issue, Gower contends that Dr. Borrell's original report met the "minimal requirement" of a good faith effort to comply with chapter 74's requirements and that the trial court abused its discretion by ordering dismissal. In his second issue, Gower contends that the trial court abused its discretion by considering evidence outside the four corners of Dr. Borrell's report to support

11

dismissal.  Gower contends in his third issue that the trial court improperly awarded attorney's fees to appellees.

**The inadequacy of Dr. Borrell's first report**

In a health care liability claim,[4] a plaintiff must serve each defendant with a report and a curriculum vitae of the report's author.  Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a).  The report must be written by an expert qualified to give an opinion on the matters in the report, must inform the defendant of the specific conduct called into question, and must provide a basis for the trial court to determine that the plaintiff's claim has merit.  *See id.* §§ 74.351(r)(5)(A), (r)(6), 74.401(a); *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002); *see also Hebner v. Reddy*, 498 S.W.3d 37, 40 (Tex. 2016) (explaining that chapter 74 aims to eliminate frivolous claims expeditiously while preserving claims of potential merit).

A report has not been "served" under the statute when it has been physically served but is found deficient.  *Moore v. Gatica*, 269 S.W.3d 134, 139 (Tex. App.—Fort Worth 2008, pet. denied) (op. on remand).  A report is deficient only if it does not represent an objective good faith effort to comply with the statutory requirements. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a)–(b), (*l*).

---

[4]A health care liability claim is, in pertinent part, "a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, . . . which proximately results in injury to or death of a claimant."  Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(13).

Upon a defendant's motion, when a court finds that an expert report does not represent a good faith attempt to comply with the statute's requirements, the court must either (1) dismiss the plaintiff's claim with prejudice and award attorney's fees to the defendant, or (2) grant one thirty-day extension to cure the report's deficiencies. *Id.* § 74.351(b)–(c); *see Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 879 (Tex. 2001) (explaining that a report does not meet the good faith standard if it merely states the expert's conclusions or if it omits any of the statutory requirements).

While the expert report "need not marshal all the plaintiff's proof," *Palacios*, 46 S.W.3d at 878, it must provide a fair summary of the expert's opinions as to the "applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6). The information in the report "does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Palacios*, 46 S.W.3d at 879. When reviewing the adequacy of a report, the only information relevant to the inquiry is the information contained within the four corners of the document. *Id.* at 878. "This requirement precludes a court from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended." *Moore*, 269 S.W.3d at 140.

We review a trial court's decision to grant a motion to dismiss alleging the inadequacy of an expert report for an abuse of discretion. *Merry v. Wilson*, 498 S.W.3d 270, 272 (Tex. App.—Fort Worth 2016, no pet.). A trial court abuses its discretion if the court acts without reference to guiding rules or principles. *Moore*, 269 S.W.3d at 139.

In their objections and motions to dismiss, all of the appellees contended that Dr. Borrell's original report was insufficient because, among other alleged deficiencies, it failed to establish Dr. Borrell's qualifications to comment about the causal connection between any breaches of the standards of care and Aaron's death and failed to adequately explain that causal connection. We agree that Dr. Borrell's report was deficient in those regards.

To qualify as an "expert report," the report must be drafted by an "expert" as that term is defined in the statute. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(5). As to the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care, an expert must be "a physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence." *Id.* § 74.351(r)(5)(C); *see TTHR, L.P. v. Coffman*, 338 S.W.3d 103, 112 (Tex. App.—Fort Worth 2011, no pet.) ("The legislature has prescribed that it is necessary for a physician to opine as to causation of damages."). The rules of evidence provide that a witness may testify on "scientific, technical, or other specialized

14

knowledge" if the witness is qualified as an expert on the matter "by knowledge, skill, experience, training, or education." Tex. R. Evid. 702.

Rule 702 does not necessarily require that a plaintiff's expert and the defendant doctor be physicians practicing in the same field. *Simpson v. Barton*, No. 08-16-00076-CV, 2016 WL 7176998, at *3 (Tex. App.—El Paso Dec. 9, 2016, no pet.). On the other hand, a medical license does not automatically qualify a doctor to testify about causation on every medical question. *See Roberts v. Williamson*, 111 S.W.3d 113, 121 (Tex. 2003). Rather, to establish qualifications, a doctor must show that he had knowledge, skill, experience, or training regarding the specific issue before the court. *See id.*; *see also Otero v. Richardson*, 326 S.W.3d 363, 371 (Tex. App.—Fort Worth 2010, no pet.) (holding that when the plaintiff's claim concerned a doctor's alleged negligence in treating an ankle fracture, the expert established his qualification by showing that he had treated "approximately 20,000 patients with orthopedic injuries"); *Menefee v. Ohman*, 323 S.W.3d 509, 514 (Tex. App.—Fort Worth 2010, no pet.) ("The proper inquiry concerning whether a doctor is qualified to testify is not his or her area of practice but rather the doctor's familiarity with the issues involved in the claim before the court."); *Collini v. Pustejovsky*, 280 S.W.3d 456, 466 (Tex. App.—Fort Worth 2009, no pet.) (op. on remand) (holding that a doctor was not qualified to opine on causation about a drug causing tardive dyskinesia when he did not state experience or training regarding prescribing that drug or diagnosing

15

tardive dyskinesia). We review a trial court's determination concerning a medical expert's qualifications for an abuse of discretion. *Otero*, 326 S.W.3d at 371.

The "injury" at issue is Aaron's death; as such, Dr. Borrell's report or curriculum vitae needed to demonstrate how he was qualified by knowledge, skill, experience, training, or education to opine about how any of appellees' acts or omissions caused the death. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(5)(C); Tex. R. Evid. 702. To do so, he needed to show that he had some knowledge, skill, experience, or training concerning the physical conditions that caused Aaron's death. *Roberts*, 111 S.W.3d at 121.

Dr. Borrell's initial report stated that he is a board-certified and practicing psychiatrist[5] and that he treats patients for stress, anxiety, drug addiction, depression, suicidal ideation, and psychosis. The report states that Dr. Borrell has treated "thousands of patients with a wide variety of *mental health conditions similar*" to Aaron's upon his admission to University. [Emphasis added.] Later, the report states,

> As a psychiatrist, I have been involved in clinical care of patients like [Aaron] hundreds of times, administration and management of clinical services provided to patients like [Aaron], program development, training[,] and research. . . . As a psychiatrist and supervisor of nurses, and in my training of hospital staff, I have become familiar with the standards of care that apply to both psychiatrists and nurses providing care to psychiatric patients.

---

[5]Psychiatry is the "medical specialty concerned with the diagnosis and treatment of mental disorders." Stedman's Medical Dictionary 1594 (28th ed. 2006).

16

Dr. Borrell's curriculum vitae similarly recites his board certification and details his experience in practicing psychiatry and publishing articles concerning psychiatry and related subjects.

However, neither the report nor the curriculum vitae show how Dr. Borrell was qualified to opine about some of the physical conditions that Aaron suffered from that led to his death, including the cause of his vomiting and his lack of oxygen associated with his brain damage. While the report discusses Aaron's out-of-range blood pressure and heart rate on days preceding the day he died and shows Dr. Borrell's familiarity with standards of care for treating those conditions, the report does not explain whether or how those conditions caused appellant's death;[6] identify the precise medical cause of Aaron's death; explain why Dr. Borrell was qualified to opine about any such cause; or explain, beyond conclusory statements,[7] why any change in appellees' alleged acts or failures to

---

[6]In his live pleading, Gower alleged that "respiratory failure, brain death, pneumonia[,] and sepsis" caused Aaron's death. Dr. Borrell's report does not explain how Aaron's out-of-range blood pressure and heart rate contributed to these conditions or how Dr. Borrell was qualified to opine about these conditions.

[7]Gower recognizes in his brief to this court that the "expert's report must contain information linking the harm to the alleged breach in a manner that is not merely conclusory." *In re Stacy K. Boone, P.A.*, 223 S.W.3d 398, 406 (Tex. App.—Amarillo 2006, orig. proceeding); *see also Farishta v. Tenet Healthsystem Hosps. Dallas, Inc.,* 224 S.W.3d 448, 453 (Tex. App.—Fort Worth 2007, no pet.) (stating that a report must demonstrate causation beyond mere conjecture).

Gower argues that one sentence in the report's final substantive paragraph sets forth Dr. Borrell's opinions on causation in a nonconclusory manner: "[H]ad [Aaron's] high blood pressure been properly monitored and treated in a timely manner, . . . or had [University] had the appropriate life-saving equipment, it is

17

act (including their alleged failures to provide undefined "appropriate medications") would have affected the outcome. *See Craig v. Dearbonne*, 259 S.W.3d 308, 313 (Tex. App.—Beaumont 2008, no pet.) (holding that a report was conclusory and insufficient when it failed to "explain what treatment would have been effective, but was not provided, or whether the treatment [the doctor] provided would have been effective if it had been started earlier"); *Hardy v. Marsh*, 170 S.W.3d 865, 870 (Tex. App.—Texarkana 2005, no pet.) (concluding that a report that stated that the patient "should have had a consultation with a vascular surgeon" was insufficient because it did not "state what additional procedures or treatment would have been provided by the surgeon" or "connect the consultation to avoidance of the amputation"). Further, while the report faults University for not having pads for an Automated External Defibrillator, the report does not explain how or why Aaron would have lived had the defibrillator been used or how Dr. Borrell would be qualified based on his education, training, or experience to make that assessment.

For these reasons, because neither Dr. Borrell's initial report nor his curriculum vitae explained his qualifications to opine about the causal link between appellees' alleged negligence and Aaron's death or adequately

---

my opinion that . . . he would have . . . survived." But a mere assertion that a patient "would have survived," without an explanation of how or why, is insufficient to satisfy section 74.351's requirements. *See Costello v. Christus Santa Rosa Health Care Corp.*, 141 S.W.3d 245, 249 (Tex. App.—San Antonio 2004, no pet.); *see also Ortiz v. Patterson*, 378 S.W.3d 667, 674 (Tex. App.—Dallas 2012, no pet.).

18

explained that causal link, we conclude that the trial court did not abuse its discretion by deciding that the original report did not qualify as a good faith effort to comply with the statute and by sustaining appellees' objections to the report.[8] *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(*l*), (r)(5)(C), (r)(6); Tex. R. Evid. 702; *Palacios*, 46 S.W.3d at 879; *Merry*, 498 S.W.3d at 272. To the extent that Gower's first issue challenges the trial court's decision to sustain these objections to Dr. Borrell's initial report, we overrule the issue.

**The trial court's denial of an opportunity to cure**

In the alternative to arguing that Dr. Borrell's first report qualified as a good faith effort to comply with section 74.351, Gower contends that the trial court should have granted him a thirty-day extension to cure any deficiencies. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(c) ("If an expert report has not been served within the period specified by Subsection (a) because elements of the report are found deficient, the court may grant one 30-day extension to the claimant in order to cure the deficiency."). He relies on our supreme court's decision in *Scoresby v. Santillan*, 346 S.W.3d 546, 549, 556 (Tex. 2011) (stating that a "trial court should err on the side of granting the additional time" and

---

[8]Given our conclusion that the initial report and curriculum vitae were insufficient in this regard and that the trial court therefore did not err by sustaining appellees' objections to the report, we decline to address all the other ways in which appellees contend that Dr. Borrell's initial report was inadequate. *See* Tex. R. App. P. 47.1; *Baylor All Saints Med. Ctr. v. Martin*, 340 S.W.3d 529, 535 n.1 (Tex. App.—Fort Worth 2011, no pet.).

19

explaining that an "inadequate expert report does not indicate a frivolous claim if the report's deficiencies are readily curable").

In *Scoresby*, the court explained that when a trial court finds deficiencies within an expert report, it should "err on the side of granting the additional time *and must grant it if the deficiencies are curable*." *Id.* at 549 (emphasis added). The court also explained that an individual's "lack of relevant qualifications and an opinion's inadequacies are deficiencies the plaintiff should be given an opportunity to cure if it is possible to do so." *Id.* The court stated that trial courts should be "lenient" in granting opportunities to cure so that a plaintiff has a "fair opportunity demonstrate that [a] claim is not frivolous." *Id.* Applying these standards, the court held that a letter written by an expert to the plaintiff's attorney that was unaccompanied by the expert's curriculum vitae, did not detail the expert's credentials or experience, and did not state a standard of care was nonetheless worthy of allowing an opportunity to cure those (and other) deficiencies. *Id.* at 550–58. The court explained,

> The purpose of the expert report requirement is to deter frivolous claims, not to dispose of claims regardless of their merits. "The Legislature has determined that failing to timely file an expert report, or filing a report that does not evidence a good-faith effort to comply with the definition of an expert report, means that the claim is either frivolous, or at best has been brought prematurely." But the Legislature has likewise recognized that when an expert report can be cured in thirty days, the claim is not frivolous. It must be remembered that "'[t]here are constitutional limitations upon the power of courts . . . to dismiss an action without affording a party the opportunity for a hearing on the merits of his cause'", and those limitations constrain the Legislature no less in requiring dismissal.

20

*Id.* at 554 (footnotes omitted). Finally, in describing when a claim should be

dismissed without giving a plaintiff an opportunity to cure, the court stated,

> To stretch the meaning of deficient to include a sheet of paper with the two words, "expert report", written on it would mock the Act's requirements. . . . In determining where to draw the line, we are guided by two considerations. One is that the Act's principal purpose is to reduce the expense of health care liability claims. . . . The other consideration is the goal of the Act's expert report requirement: to deter frivolous claims. An inadequate expert report does not indicate a frivolous claim if the report's deficiencies are readily curable.

> We conclude that a thirty-day extension to cure deficiencies in an expert report may be granted if [1] the report is served by the statutory deadline, if [2] it contains the opinion of an individual with expertise that the claim has merit, and if [3] the defendant's conduct is implicated. We recognize that *this is a minimal standard*, but we think it is necessary if multiple interlocutory appeals are to be avoided, *and appropriate to give a claimant the opportunity provided by the Act's thirty-day extension to show that a claim has merit. All deficiencies, whether in the expert's opinions or qualifications, are subject to being cured before an appeal may be taken from the trial court's refusal to dismiss the case.*

*Id.* at 556–57 (emphasis added); *see id.* at 558–60 (Willett, J., concurring)

(describing the standard for granting an opportunity to cure as "lenient,"

"benevolent," and "low, and indicating that such an opportunity should be granted

when "someone with expertise express[es] an opinion that the plaintiff has a

meritorious malpractice claim against the defendant"); *see also Certified EMS,*

*Inc. v. Potts*, 392 S.W.3d 625, 631 (Tex. 2013) (emphasizing that the

"Legislature's goal was to deter baseless claims, not to block earnest ones");

*Haskell v. Seven Acres Jewish Senior Care Servs.*, 363 S.W.3d 754, 760 (Tex.

App.—Houston [1st Dist.] 2012, no pet.) (holding that documents submitted by a

plaintiff did not meet the *Scoresby* standard when they did not tie the plaintiff's injury to any alleged wrongful action of a defendant).

Dr. Borrell's report in this case, although deficient for the reasons explained above (and perhaps other reasons as argued by appellees) meets the three-part "minimal" standard of *Scoresby* for an opportunity to cure. 346 S.W.3d at 557. First, the report was served by the statutory deadline. *See id.*; *see also* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a).

Second, the report contained the opinion of an individual with general expertise that Gower's claims have merit. *See Scoresby*, 346 S.W.3d at 557. Dr. Borrell recited that he is a board-certified psychiatrist, has been licensed since 1971, and has treated "thousands" of patients for conditions similar to Aaron's conditions upon his admission to University. He also stated that he was familiar with the laws of Texas concerning the voluntary admission of mental health patients and concerning mental health hospital staffing requirements. Dr. Borrell further expressed that he had experience managing, supervising, and training nursing staff in psychiatric hospitals and had become familiar with standards of care applying to psychiatrists and nurses in that setting. He stated, "I regularly give orders to nurses regarding patients like [Aaron], and I follow up on the provision of such orders as part of my clinical practice. Further, based upon my training and experience I am familiar with the staffing requirements for facilities like [University] and its parent companies." Finally, Dr. Borrell stated,

22

I have experience and I am familiar with the standard of care that nurses, physicians, and hospitals treating mental healthcare patients should follow when a patient's vitals are out of normal range. Specifically, I am familiar with the standard of care that nurses, physicians, and hospitals should follow when a patient's blood pressure is above normal range.

We conclude that these statements, along with the remainder of Dr. Borrell's report, establish his expertise concerning the general subject matter of Gower's claims. Moreover, our holding above concerning Dr. Borrell's failure to establish his qualifications to opine about causation is not inconsistent with our conclusion in this regard. We note that the court in *Scoresby* stated that the expert's letter in that case "easily" met the standard of containing the opinion of an individual with "expertise." *Id.* The court reached this holding even though (1) the defendants challenged the expert's qualifications, (2) the expert's letter "did not attach [the expert's] curriculum vitae or describe his credentials or experience other than to state that he [was] a 'Board-Certified neurologist,'" and (3) the court "express[ed] no view on the adequacy of [the expert's] qualifications." *Id.* at 550–52, 557. Thus, our conclusion above that Dr. Borrell failed to establish qualifications to opine about causation does not foreclose Gower's ability to cure the deficiencies in the report. *See id.* at 557 ("All deficiencies, whether in the expert's opinions or qualifications, are subject to being cured before an appeal may be taken from the trial court's refusal to dismiss the case.").

Third, Dr. Borrell's report implicated appellees' conduct. *See id.* Although perhaps in a conclusory or vague fashion (as argued by appellees), the report faulted Universal, University, and Dr. Vasavada for several acts and omissions. *Cf. Blevins v. Bishai*, No. 09-16-00071-CV, 2017 WL 1425590, at *10 (Tex. App.—Beaumont Apr. 20, 2017, no pet. h.) (mem. op.) (holding that a plaintiff was not entitled to an opportunity to cure when a report stated that the defendant doctor "did not breach the standard of care"); *Alsup v. Hickory Trail Hosp.*, No. 05-16-00527-CV, 2017 WL 1046769, at *8 (Tex. App.—Dallas Mar. 20, 2017, no pet.) (mem. op.) ("Appellant could cure all of these alleged deficiencies within the thirty-day extension period by submitting a more detailed, non-conclusory expert report."); *Post Acute Med., LLC v. Montgomery*, 514 S.W.3d 889, 894 (Tex. App.—Austin 2017, no pet.) (rejecting an opportunity to cure when the report did "not in any way implicate" the defendant's conduct). For example, the report faulted Universal for failing to use ordinary care to monitor and supervise employees charged with the supervision of psychiatric patients and for failing to ensure that patients were properly evaluated and treated; faulted University for those same acts and for failing to properly stabilize Aaron, for prescribing excessive medication to him, and for failing to adequately respond to his out-of-range blood pressure and heart rate; and faulted Dr. Vasavada for not adequately monitoring Aaron's blood pressure and heart rate and for not providing appropriate medications for those conditions.

Appellees argue that the trial court acted within its discretion by denying an opportunity to cure because Dr. Borrell's report omitted statutory requirements. But no report that needs curing contains all the requirements, and the statute contemplates an opportunity to meet the requirements through a second chance. *See Scoresby*, 346 S.W.3d at 550, 557 (holding that a trial court did not err by granting an extension even though the expert did not provide a curriculum vitae, the expert did not explain his credentials, and the report did not state a standard of care); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(c); *Koutsoufis v. Pinnacle Health Facilities GP V*, No. 02-16-00150-CV, 2017 WL 370956, at *6 n.4 (Tex. App.—Fort Worth Jan. 26, 2017, no pet.) (mem. op.) (relying on *Scoresby* to state that even if an expert was "unqualified to opine as to the standard of care applicable to [certain defendants], such a deficiency would not warrant outright dismissal with no opportunity to cure").

Appellees also contend that Gower was not entitled to an extension because their objections gave him notice of the report's deficiencies, and he did not address those deficiencies during the lengthy period before the trial court sustained their objections.[9]  We conclude, however, that in most circumstances, including these circumstances, penalizing a plaintiff for declining to fix a report's alleged deficiencies before a trial court rules on objections to the report would be

---

[9]At the motion to dismiss hearing, the trial court indicated that its busy docket resulted in the lengthy delay before the trial court heard and ruled on appellees' objections and motions to dismiss.

unreasonable and contrary to the purpose of section 74.351(c), which is to grant an opportunity to cure after "elements of the report are found deficient."[10] Tex. Civ. Prac. & Rem. Code Ann. § 74.351(c).

It is true, as appellees argue, that the court in *Scoresby* indicated that a trial court should not grant an opportunity to cure when the initial report "mock[s] [section 74.351's] requirements." 346 S.W.3d at 556. But in giving an example of such a mockery, the court cited a case in which the plaintiff relied only on a thank-you-for-your-referral letter from one physician to another physician as satisfying the section's requirements. *See id.* (citing *Lewis v. Funderburk*, 253 S.W.3d 204, 206 (Tex. 2008)). The facts here are not analogous to that circumstance.

We emphasize and rely on the language from *Scoresby* that a trial court "must grant" an opportunity to cure if deficiencies are curable. *Id.* at 549. In dismissing Gower's suit, the trial court did not expressly find that the deficiencies in Dr. Borrell's report were incurable; rather, the court appeared to recognize that the deficiencies were curable, stating, "I . . . find that [the report] is not a good

---

[10]We recognize that the report's reference to another patient was a glaring error. However, typographical errors within a report will not render a report insufficient under section 74.351 when the report otherwise satisfies the requirements of that section. *See Keller SNF v. Koutsoufis*, No. 02-16-00227-CV, 2017 WL 117318, at *7–8 (Tex. App.—Fort Worth Jan. 12, 2017, no pet.) (mem. op.) (holding that a report complied with section 74.351 even though the report referred to a skilled nursing facility that was not connected to the plaintiff's claim).

faith effort to bring the report into compliance *as could have been done any time during the last year.*" [Emphasis added.]

Finally, we disagree with Dr. Vasavada's argument that allowing for an opportunity to cure in this case will "render the trial judge powerless to address incompetent reports in any effective way." The trial court has not ruled on whether the amended and supplemental reports submitted by Gower cure the deficiencies in Dr. Borrell's original report.[11] If the trial court finds that the amended and supplemental reports cure the deficiencies in the original report, the trial court will have effectively addressed those original deficiencies. Conversely, if the trial court finds that the amended and supplemental reports still do not satisfy section 74.351's requirements, the court has authority to dismiss Gower's suit (subject to Gower's appeal of such a decision), thus providing appellees with a remedy for such a deficiency. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b).

In sum, we agree with appellees' argument that an opportunity to cure deficiencies under section 74.351(c) is not automatic; however, we also conclude that *Scoresby* and the other decisions cited above shape the contours of the trial court's discretion—providing the guiding rules and principles—concerning whether to grant such an opportunity. 346 S.W.3d at 557; *see Moore*, 269

---

[11]We conclude that it would not be appropriate for us to consider the adequacy of the amended and supplemental reports without allowing the trial court an opportunity to do so.

27

S.W.3d at 139. We conclude that under the principles discussed in those cases, Gower was entitled to an opportunity to cure. Therefore, we sustain Gower's first issue to the extent that he appeals the trial court's decision to dismiss his suit for a deficient expert report without granting an opportunity to cure under section 74.351(c). *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(c).

**Consideration of extrinsic evidence and attorney's fees**

In his second issue, Gower asserts that the trial court erred by considering extrinsic evidence: documents that University and Universal attached to their objections to Dr. Borrell's report. In his third issue, Gower argues that the trial court improperly awarded attorney's fees to appellees. In light of our holding above that requires reversal of the trial court's orders that dismissed Gower's claims, we conclude that we must also sustain Gower's challenge to the award of attorney's fees. *See id.* § 74.351(b)(1)–(2) (linking an award of attorney's fees with the dismissal of the plaintiff's claim). We sustain Gower's third issue. We decline to address his second issue, as resolution of the question concerning the trial court's consideration of extrinsic evidence is not necessary to the disposition of this appeal. *See* Tex. R. App. P. 47.1.

28

**Conclusion**

Having sustained part of Gower's first issue and all of his third issue, we reverse the trial court's orders that dismissed Gower's claims against Universal, University, and Dr. Vasavada and that required Gower to pay attorney's fees. We remand this case to the trial court for further proceedings consistent with this opinion.

/s/ Terrie Livingston

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; SUDDERTH and KERR, JJ.

DELIVERED:  July 20, 2017